COÖS.

---

## ATLANTIC & ST. LAWRENCE RAILROAD CO. v. THE STATE.

A railroad, leased for 999 years, may be taxed either to the lessor or to the lessee.

The rent which the lessee promised to pay is evidence of the market value of the road at the date of the lease. But if the rent is more, or less, than the use of the road is worth, the taxable value of the road is not on that account more, or less, than the price for which the road can be sold.

APPEAL, for the abatement of a tax assessed to the plaintiffs in 1879. Facts found by a referee.

*Ray, Drew & Jordan* and *Jeremiah Smith*, for the plaintiffs.

I. The tax should have been assessed to the Grand Trunk Railway Co. of Canada, to whom the road was leased in 1853 for 999 years, who practically own the road, and will continue to own it

(if they fulfil their lease covenants, as presumably they will) for centuries, and who consent to be taxed for it, and are bound by the covenants of the lease to pay all taxes lawfully assessed upon all the property of the plaintiffs. " Real and personal property shall be taxed to the person claiming the same, or to the person who is in the possession and actual occupancy thereof, if such person will consent to be taxed for the same; but such real estate shall be taxed in the town in which it is situate." G. L., c. 54, s. 11; *Savings-Bank* v. *Nashua,* 46 N. H. 400, 401; *Brewster* v. *Hough,* 10 N. H. 138; *Bowles* v. *Clough,* 55 N. H. 389; *R. R. Co.* v. *Com.,* 1 Bush. 250; *Baldwin* v. *Trustees,* 37 Me. 369. If the tax were not paid, an extent could be issued for it, leviable on any property that belonged to the plaintiffs on the first day of April, 1879. G. L., c. 62, s. 6. But there is no such property on which the extent could be levied except the reversion, which will be worthless for nearly a thousand years.

II. The railroad should be taxed as an entire thing. The different interests of lessors and lessees, stockholders and bondholders, mortgagors and mortgagees, are not separated in the assessment. The language of the statute is " road, rolling stock, and equipments." G. L., c. 62, s. 1. These words refer to tangible property within the state. It is not the rent, nor the covenant to pay rent, nor the lease, but the thing leased, the road itself, that is the subject of taxation. And the road is taxable only at its present actual value, its fair market value. *State* v. *R. R. Co.,* 27 Ill. 64; *State* v. *Metz,* 31 N. J. 378. . The lease of 1853 was practically a conditional sale; and the so-called " rent " is the purchase-money, payable in annual instalments. If the term of the lease had been " as long as wood grows and water runs," instead of " 999 years," would the present interest of the lessors have been any more, or any less, than it is now? The income of the lessors is not derived from the present business of the road, but from a contract made twenty-seven years ago on a mistaken basis of value. For the lessees, who are for all practical purposes the owners of the road, it earns nothing. The lease divides the property into two parts, the lessees' interest being the whole beneficial use and possession for 999 years, and the lessors' interest being the reversion at the expiration of the lease. The sum of the parts does not exceed the whole. The value of the property is not increased by the division and separation of interests. *Logan* v. *W. County,* 29 Penn. St. 373, 375. The rent is no part of the road. *Van Rensselaer* v. *Dennison,* 8 Barb. 23; *Robinson* v. *County,* 7 Penn. St. (7 Barr) 161; *M'Murphy* v. *Minot,* 4 N. H. 251, 254; Taylor Land. & Ten., s. 426; *Childs* v. *Clark,* 3 Barb. Ch. 52. The rent is not the legal test of the actual value. *State* v. *Platt,* 24 N. J. L. (4 Zab.) 108, 118; *State* v. *Randolph,* 1 Dutcher 427; *Hayward* v. *Brinkworth & a. ( Overseers ),* 10 Law Times N. S. 608; *Edwards* v. *Hatton,* L. R. 1 Ad. & Ecc. 21, 31; *Newmarket R. Co.* v.

*Church Wardens*, 3 E. & B. 94, 101; *South-Eastern R. Co.* v. *Dork-ing*, 3 E. & B. 491, 499, 505, 507, 508; *Sunderland* v. *Sunderland*, 18 C. B. (N. S.) 531, 583. The rent named in the lease is a piece of evidence having some bearing on the value of the road at the date of the lease, August 5, 1853, and consequently, perhaps, some remote bearing on the value of the road on the first day of April, 1879. But it is not conclusive of the value in 1853; much less of the value in 1879.

The theory, that the rent receivable under the lease is the legal measure of the actual present value of the road, may be tried by its practical consequences. Suppose a railroad, leased at six per cent., is now earning twelve per cent. for the lessees, and its present salable value is double the principal sum upon which the rent was based: would the assessors appraise that road in accordance with the rate of rent, or in accordance with its present value? If the rental rate is not the controlling test of value when its application operates in favor of the tax-payer, why should it be the test when it operates against him? Suppose a road is leased at six per cent., and continues to earn that amount, and would sell to-day for the principal sum on which the valuation or rent was based,—the lessees, however, in view of the recent general lowering of the rate of interest, consent (as they have in some cases) to reduce the future rent: the assessors would not make a corresponding reduction in the next valuation. They would say to the lessors, If you choose to give away part of your own revenue, you can do so, but you cannot give away the state's revenue. Your road is confessedly worth as much and would sell for as much as before the reduction, and therefore you must submit to the same tax. Otherwise it would follow, that if the lessors relinquished their claim to a year's rent, the state must relinquish the right of taxation for that year.

If the lessors' and lessees' interests in this road were put together, and sold by auction in one lot, the lessees' covenant to pay rent would not be considered by bidders in determining what they would offer for the whole title. The covenant would be extinguished by the sale. The union of the particular term and the reversion would operate as a merger. And the road, as a whole, is to be estimated by tax assessors at its fee-simple value, as it would be with the lessors' and lessees' interests merged in one ownership. The law puts railroads on the same taxable footing as ordinary real estate. In taxing land, the assessors do not inquire what particular interests have been carved out of the fee. They do not assess each interest separately, unless specially directed by statute so to do. They ascertain the value of the estate in fee simple, as if no particular interests had been carved out of it. *Smith* v. *Messer*, 17 N. H. 420, 428; Bur. Tax., *s.* 98. The fee simple includes all the particular estates that have been carved out of it; but it does not include contracts made in reference to the particular estates which would

be extinguished by a union of those estates. If such contracts are not taxable as contracts or evidences of indebtedness, they are not taxable at all, and certainly not as parts of a whole which is complete without them. The subject of taxation in this case is the road, the reversion of the plaintiffs, and the particular estate of the lessees, and not the reversion plus the covenant to pay rent. The inclusion of the particular estate necessitates the exclusion of the covenant. It is impossible to conceive of the three as united.

*The Attorney-General*, for the defendants.

I. By the act of June 30, 1847, the plaintiffs were made a corporation within this state, and their corporate existence was not terminated here by the act of July 12, 1856, sanctioning the lease. And if the plaintiffs had no other property than the reversion on which an extent for their tax could be levied, the right reserved in those acts to alter, amend, or repeal them would leave no cause to fear a non-payment of the tax. The lease provides for keeping up their organization. Section 11, *c.* 54, Gen. Laws, does not apply to railroads.

II. What is the value of this road under our laws for taxing purposes? This is wholly a question of fact, and we cannot see that any question of law enters into it, other than " the question of the admissibility of evidence." *Cocheco Co.* v. *Strafford*, 51 N. H. 475, seems to be conclusive on this point. The referees in this case are to find the actual " value of the road, rolling-stock, and equipments " on the first day of April, and they are to consider all such evidence as in their judgment shall have a pertinent bearing or throw any light upon the question, without regard to whether it comes within the technical legal rules of evidence or not. That evidence of the net income derived by the road upon the capital invested is a very important element in determining its value, is too plain for argument; and although no fixed and certain rule, which shall govern in every case, has been laid down by the authorities, the whole matter of valuation and taxation of railroads being in a crude and unsettled state, so far as there is any fixed and definite rule laid down, it is, that this matter of net income is a very essential test, and, as we contend, in some cases a controlling element in determining the actual value. *State* v. *1 ll. Central R. R.*, 27 Ill. 64; Hill. Tax. 285, *s.* 48; *Queen* v. *London & N. W. R. Co.*, L. R. 9 Q. B. 134. How were the board of equalization, and how are the referees, to ascertain the " actual value " of this particular road? How is the appraisal to be made, and what elements of value does it possess, upon which an appraisal can be based? It has no " rolling-stock and equipments," or other tangible property. It has no real estate outside of its road-bed and embankments, and these have no marketable value whatever, and are worth no more than any other bank of sand and gravel of the same length, except

as they are valuable for the uses to which they are put, to wit, to be used as a railroad.

In *State* v. *Illinois Central R. R.*, 27 Ill. 64, the court say,— "Where property has a known and determinate value, ascertained by commerce in it, as in most kinds of personal property, or fixed by law as money, there can be no difficulty. But there are many kinds of property as to which the assessor has no such satisfactory guide. Such is peculiarly the case with railroad property, and other similar property, constructed not only for the profit of the owners, but for the accommodation of the public, under the sanction and by the exercise of the sovereign power of the state. In such cases the inquiry should be, What is the property worth, to be used for the purposes for which it is constructed? and not for any other purpose to which it might be applied or converted, or for which it might be used. In such cases, if the property is devoted to the use for which it is designed, and is in a condition to produce its maximum income, one very important element for ascertaining its present value is discovered, and that is its net profits. When property is thus improved, it is manifest that it is more or less valuable as it yields a greater or less profit in its product and economical use. No prudent purchaser of such property would neglect, in the first instance, to look at the income the property yields, so that he might thereby judge what profits he might in the future reasonably expect from his investment." And our position is, that, whatever might be the value of this road if it were still run by the lessors, and whatever other elements might in such case have been considered as tests or elements of value, the only criterion now is, What does this road produce? What income do its stockholders derive from it? And when that is ascertained, that is the true basis upon which to determine its actual value for taxation. The Atlantic & St. Lawrence Railroad was receiving what was equivalent to a six per cent. dividend on its capital invested in this state; it had no rolling-stock and equipments that could be taxed; its reversionary interest was valueless; so that all there was left upon which a tax could be assessed was the land upon which its track was laid, and which constituted the road. What it originally cost to construct the road would be no just criterion of value; it could not be tested by a sale, for there was nobody to buy; and the assessors were therefore obliged to fall back upon the only mode by which its actual value could be ascertained, which was, what it was worth to use as a railroad. It was receiving as income that which being capitalized produced a sum which was the value of the road for railroad purposes. There was no taxing of the lease, or of the rent, but the tax was assessed upon the " thing itself," making use of the rent to measure the value of the " thing." What other mode, under the circumstances, can the referees adopt to ascertain the actual value of what is left of this road?

But inquiry is made, Suppose a railroad leased at six per cent. is now earning twelve per cent. for the lessees: would the assessors value the road by the rent, or by its increased earnings? One answer to this question is this: By approving this lease the state has tacitly agreed that the actual value of the road shall be the sum represented by its annual income. It virtually says to the lessees, You may take and run this road; and if you will keep it in good running order, pay its debts, pay all the taxes assessed upon it, and pay the stockholders six per cent. upon their capital invested, &c., you can have whatever you earn above that sum. And I do not think the state ought to go back on that agreement, and claim a higher valuation, any more than the Grand Trunk Railway ought now to be permitted to say, for the purpose of getting rid of its taxes, that the rent it agreed to pay is too high.

It is said that this road is of no value to the lessees, and therefore it should not be taxed at all, or at least that the taxes should be merely nominal. If it were pertinent to the question at issue, we conceive that it could easily be shown that the view taken by the other side is an extremely narrow one, and that the real value of this piece of road to the lessees does not consist merely in what is earned by this particular link in their great line of transit. This railroad is only one link in their railroad chain, reaching from Chicago and Detroit to Portland. It gave them what it was absolutely necessary they should have, to wit, a direct outlet to the sea. It connects them with that part of their line extending to the great West, and also with their own lines of steamers which take their freights across the ocean. If, as they say, this separate link does not pay, it helps them to make other portions of their road pay, and renders of great value what would otherwise be an imperfect line, because without it they would be at the mercy of other corporations in getting their freights to their destination; whereas, by controlling this particular piece, they have one continuous line of road from their point of departure to the seaboard.

But this is nothing to the purpose. The lessees, for reasons satisfactory to themselves, deemed it important to have this road. They fixed upon the price which they would pay its owners for the use of the same. Whether the price so paid was more than the use of the road, reckoned as a separate road, would be worth, can make no difference. It was a price which they were willing to pay; and the presumption is, that they knew what they were doing when this agreement was entered into. The price, then, which the lessees pay, and which the lessors receive, constitutes a fixed, certain, and permanent income to the stockholders of this road; and its bearing upon the value of the stock therein, and the road itself, is seen from the fact that but very few shares of stock are owned in this country, but are mostly held and owned abroad, where the projectors and owners of the Grand Trunk Railway reside, where the importance of the connection made by the pos-

session of the Atlantic & St. Lawrence road is well understood, and where the market value of its stock on the first day of April, 1879, was from six to eight per cent. above par. If the lessors' interest in the road were sold at auction, this fixed and permanent income, derived from the lessees' covenant to pay the rent, would be considered by the bidders, and would constitute its chief element of value. *State* v. *Ill. Central R. R*, 27 Ill. 64. A farm is assessed at its value, whether assessed to the owner or occupant. The assessors make no difference in its valuation, whether they assess it to the owner who has an income out of it, or to the occupant who pays too large a rent and loses money by the operation. The fact that the tenant does not make the business pay him is not taken into the account.

DOE, C. J. "Every railroad corporation  *  *  *  shall pay to the state an annual tax upon the actual value of the road, rolling-stock, and equipments." G. L., c. 62, s. 1. The plaintiffs are lessors, and the Grand Trunk Railway Company are lessees, of a railroad running from Portland to Canada, through Maine, New Hampshire, and Vermont. The lease was made in 1853 for 999 years. The personal property used in operating the road belongs to the lessees; and the questions raised by the referees' report relate to the taxation of so much of the leased real estate as is situated in New Hampshire.

I. "Real and personal property shall be taxed to the person claiming the same, or to the person who is in the possession and actual occupancy thereof, if such person will consent to be taxed for the same; but such real estate shall be taxed in the town in which it is situate." G. L., c. 54, s. 11. If this section is applicable to railroads, its effect is controlled in this case by the law of tax appeals, which directs such appeals to be disposed of by such orders as justice may require. G. L., c. 61, s. 9. When the property of an incorporated owner of a railroad highway is an estate of perpetuity, a lease of it for 999 years may be regarded, for many practical purposes, as a conveyance of the whole estate upon the condition subsequent of payment of an annuity called rent. 4 Kent Com. 85, 107; *Denn* v. *Barnard*, Cowp. 595, 597. And this road may be lawfully taxed, either to the lessors, because they may be regarded as, in some technical sense, the owners of the road, or to the lessees, because, as tenants for 999 years, they are the owners in some practical sense, and, requesting to be taxed for it, they could not object if their request were complied with. Practically and legally, it is immaterial whether it is taxed to the lessors or the lessees. Whether it is taxed to the former or the latter, the same real estate (including the franchise, *Robinson* v. *Dover*, 59 N. H. 521, 527) is assessed, its value is the same, and its tax is the same, and is paid by the same corporation, the lessees, who by the terms of the lease are bound to pay it. And an assessment of it,

either to the plaintiffs or to the lessees, would be no just cause of abatement. *Carpenter* v. *Dalton*, 58 N. H. 615.

II. The value of the New Hampshire part of this road may not be so easily ascertained as the value of a farm; but the law of the appraisal of each is the same. The difficulty in this case, arising from the character and situation of the property, is a difficulty of fact and not of law. The actual value of the road at a particular time is a fact to be found for the purpose of finding what was then its share of the public expense. That time was the first day of April, 1879. And its actual value on that day was its market value on that day. *Cocheco Co.* v. *Strafford*, 51 N. H. 455, 467, 475–482. The market value of a leased farm does not depend, in the slightest degree, upon the question whether it is assessed, in the selectmen's book, to the lessor or to the lessee. To be of the value of $2,000, it must be capable of being sold for that sum at a fairly conducted sale, at a sale conducted with reasonable skill and diligence in respect to time, place, and circumstances, for the purpose of obtaining the highest price. *State* v. *James*, 58 N. H. 67. The difficulty in appraising this road is in estimating, upon a variety of circumstantial evidence, what is the highest price it could have been sold for on the first day of April, 1879. If it had been sold or leased on that day, under circumstances favorable for showing its market value, evidence of the price for which it was then sold or leased would be the best. It would be simple, direct, and satisfactory. In the absence of such evidence the referees must resort to evidence less simple, less direct, and perhaps less satisfactory.

The market values of some roads are shown by their earnings, the profits made by those who operate them. It is claimed that the evidence on this point shows that the market value of the New Hampshire part of this road is less than nothing, that part being run at a loss. This is a point to be thoroughly investigated. The question of profit or no profit is one of fact, to be decided upon all the evidence that both parties produce. If no net profit is derived from the operation of the road, it does not necessarily follow that the road has no market value. A railroad that makes no profit by the transportation of freight and passengers, may be of some value for increasing the business of other roads, or being useful in some other way. *Queen* v. *London & N. W. R. Co.*, L. R. 9 Q. B. 134. The fact that net earnings are or are not derived from the transportation of freight and passengers is, of course, material evidence on the question of the value of the road. If the road is so situated, and in such a condition, that without net earnings it can in a fairly managed market be sold or leased at some price, that price is evidence on the question of value.

The road is a public highway that cannot be discontinued without legal authority. *McDuffee* v. *R. R.*, 52 N. H. 430, 449. And the fact that, if it should be discontinued, some of its materials might be removed (provided they did not revert to the owner of

the soil where the right of way was taken by process of law or equivalent conveyance), is a piece of evidence depending for its weight upon various considerations, one of which would be the probability of a discontinuance of the road being authorized. The value of iron rails might be destroyed by making them a part of a worthless road that could not be dismantled and abandoned.

The case is as if a citizen of Concord were the lessor of the road, and another citizen of Concord were the lessee, neither of them being a corporation, or each being a corporation sole, without corporate stock or shares. The rent is the plaintiffs' money when they receive it. But their assessment in this case is made under a statute that imposes, not a tax upon the money of the plaintiffs and all other persons, or upon the income of the plaintiffs and all other persons, or upon the profit of all executed or executory contracts, but a tax upon real estate, which, in this case, would probably be of trifling value without the public franchise of maintaining a track across rivers and other highways. The taxable value of the road is the market value which the defendant would pay for it if it were taken from its owners by the defendant for free public use, as turnpikes and toll-bridges have been taken, by an exercise of the power of eminent domain. *Crosby* v. *Hanover*, 36 N. H. 404, 420; *Edmands* v. *Boston*, 108 Mass. 535, 544; *Burt* v. *M. Ins. Co.*, 115 Mass. 1, 15.

A sale or lease of the road, made at any time, is admissible evidence on the question of its value at that time; and its value at any time, not too remote, is admissible evidence on the question of its value in 1879. If a sale or lease of it had been made in 1878, it might be a valuable piece of evidence. The more remote the sale or lease from April 1, 1879, the less weight it is entitled to. Substitute for the road a farm, leased in 1853 for 999 years, at $100 annual rent, to be appraised at its actual value on the first day of April, 1879: the selectmen might regard the rent which, in 1853, the lessor agreed to take and the lessee promised to pay, as evidence of what the contracting parties then thought the farm was worth, and its value at that time as evidence of its value in 1879. They might consider such evidence as of great, or little, or no importance. They might find the rent was too high, or too low, or precisely what the use of the farm was worth when the lease was made. They might find the farm, or its use, was worth at that time twice as much as in 1879, or only half as much; and they would not suppose themselves justified in appraising the farm at twice its value, or at half its value, because twenty-six years before it had been sold or leased for twice as much, or half as much, as it was worth at the time of their appraisal. As the lease would be nothing more than evidence of what the parties thought the farm was worth when they made the lease, it would have no greater weight as evidence than a sale made by the same parties at the same time. A conveyance of the farm in the afternoon of

April 1, 1853, for 999 years, would not be greater proof of its value, than a conveyance of it in the forenoon of the same day in perpetuity.

By a lease of a horse for a number of years at $20 a year, a part of the title, a special property, passes from the lessor to the lessee. If the use of the horse turns out to be worth more, or less, than $20 a year, his taxable value is not affected by that circumstance. If the use is worth $10 a year more than the lessee pays, the lessor's annual loss of the $10 does not decrease the market value of the animal. If the use is worth $10 a year less than the lessee pays, the $10 thus annually gained by the lessor becomes his taxable money, when he gets it, but does not become a part of the leased property, or an element of its market value. The gain of one party is the loss of the other; and the horse is not worth more, or less, by reason of the balanced loss and gain of the owners of the two parts of the title.

If the value of this leased road increased from the date of the lease to the present time, the less value of 1853 cannot be taken as its present value on which its present share of the public expense is to be computed; and if its value diminished during that period, its greater value in 1853 is not the test of its present share of the common burden. For the purpose of taxation in 1853, it should have been appraised at the highest price it could have been fairly sold for on the first day of April of that year. For the purpose of taxation this year, it should be appraised at the highest price it could have been fairly sold for on the first day of April of this year, and not at the greater or less price for which it could have been sold or leased at some former time. The price at which it was sold or leased at any former time is evidence only so far as its proof of a former value tends to show the price for which it could have been sold on the first day of April, 1879. If, on that day, it could not have been leased by an owner of the entire title at the price of 1853, it would be as wrong to make that price the test of the value of 1879 as to appraise it now at less than its present value because it was once sold or leased for less than it is now worth. Let every owner of real estate insist upon its being now taxed, not at its present market price, but at the least price at which it ever was or ever could have been sold or leased, and let assessors tax all real estate, not at its present market price, but at the highest price at which it ever was or ever could have been sold or leased, and, in the conflict between the land-owners on one side and the assessors on the other, the error of both sides would be apparent.

If the conveyance of 1853, for 999 years, had been a conveyance in perpetuity for a sum of money paid at the time, and that money put at interest had continued to this day to produce an income for the plaintiffs equal to the rent stipulated in the lease, and the road were not now worth that sum, it would not now be appraised at

the price of 1853. If the price had been, not a round sum paid at the time of sale, but an annuity to be paid, the annuity would be no better evidence of the value of the road than a single equivalent sum paid as the price. As the annuity would not be evidence, except so far as it tended to show what the road was worth in 1879 by proving what it was worth at the time of the sale, the market value of the annuity in 1853 would need to be known. The only difference between the evidence of a round sum paid in 1853, and the evidence of an annuity then agreed to be paid for 9, 9 years, or forever, would be in the necessity of finding for what round sum the annuity could have been sold in 1853.

If the conveyance of 1853 for 999 years be regarded as a lease and not as a conveyance in perpetuity, the case is governed by the same law. Let the lease be regarded as a transfer that splits the title in two parts, by conveying one part to the lessees and leaving the other in the lessors. It did not make the two parts greater, or less, than their sum. The separation of the parts took place instantaneously at the delivery of the lease. Immediately after that point of time, the part held by the plaintiffs and the part held by the lessees were no more and no less than they were immediately before, when the plaintiffs held them both undivided. The partition of the title did not make the road anything more, or less, than the road, or its market price anything more, or less, than its market price. The mere division of the title was not an augmentation or diminution of its value.

If the lease is a better bargain for the lessors than for the lessees, the lessees lose what the lessors gain. The neutralization of the loss and gain does not diminish or increase the value of the road. If the lessors' gain could enhance the value of their part of the title, the lessees' loss would diminish the value of their part to the same extent. The road, plus the lessors' gain, less the lessees' loss, would be equal to the road. If it could be said that the lessors' part of the title is worth $10 more than the whole of it, it must also be said that the lessees' part is worth $10 less than nothing. The positive quantity, balanced by the negative, would give the equation the same significance it would have if the lease were a better bargain for the lessees than for the lessors. If a conveyance of the entire title would vest in the buyer the lessors' right to receive the rent, it would also vest in him the lessees' obligation to pay it.

If leased property were appraised above its value when the lease, twenty-six years after its date, becomes a better bargain for the lessor than for the lessee, it would be appraised below its value when the lease becomes a better bargain for the lessee than for the lessor. Were the former value the test when higher than the present value, it would be the test when lower. It is not the test in either case. The lease is evidence, but not conclusive proof, on the question of the value of the road in 1853. That value, when

found, is evidence, but not conclusive proof, on the question of the value of the road in 1879; and the weight of this and all other evidence is a matter of fact to be determined by the referees.

*Report recommitted.*

All concurred.