WINNIPISEOGEE LAKE COTTON & WOOLEN MANUFACTURING COMPANY *v.* GILFORD.

SAME *v.* SAME.

SAME *v.* SAME.

A party, by moving for judgment upon the findings, waives his exceptions to rulings made against him at the trial.

The record of a judgment in a suit for an abatement of taxes, not too remote in point of time, is competent but not conclusive evidence of the value of the property taxed, in a subsequent suit between the same parties for an abatement of a later tax upon the same property.

The price received by the shareholders of a corporation for the entire capital stock upon a sale thereof, is competent evidence of the taxable value of the corporate property, although the price might have been less if the corporation's rights in certain water privileges had been correctly understood, the corporation not objecting.

Limitations, by contract with third persons, of the owner's use of his water rights, no greater than those imposed by law, are not an encumbrance upon the property.

APPEALS, from refusals of the selectmen of Gilford to abate parts of taxes assessed by them upon the plaintiffs' real estate, in 1890, 1891, and 1892. Facts found by the court.

The plaintiffs were incorporated, June 28, 1831. The preamble of their charter is as follows: "Whereas William Bachelder, John Chase, Nathan Bachelder and their associates, being owners of the farm, mill and mill privileges, commonly called Folsom's Mills, in Meredith, upon which the proprietors have erected, and are about to put in operation, two factories for the manufacture of cotton and woolen cloths, and for the manufacture of machinery at their said mills, for the greater convenience in carrying on said business, have petitioned the legislature, praying that said owners and proprietors may be incorporated and made a body politic and corporate, which prayer appearing reasonable, therefore," etc. The corporation was authorized to manufacture and

sell machinery, purchase and hold real estate, erect dams, mills, and other buildings for manufacturing all kinds of cotton and woollen yarn, thread, and cloth, "provided that the whole amount of real and personal estate at any time vested in the business of said corporation shall not exceed the sum of $100,000." By an amendment of the charter in 1846 (Laws 1846, c. 437), the corporation was authorized to increase its capital to $1,000,000, and "to acquire and hold in this state such real and personal estate, not exceeding in the whole the said sum of one million of dollars, as may be necessary to improve the water-power of the Winnipiseogee, Pemigewassett, and Merrimack rivers, and for that purpose to make such contracts and grants, to and with the proprietors and owners of lands, mills and mill privileges on the said rivers, and their tributary streams and waters, as may be necessary to accomplish those objects." Individuals and corporations owning mills or mill privileges upon the rivers named, or upon their tributaries, were authorized to hold stock in the corporation.

The plaintiffs, at the times of the assessments, were owners of the land in Gilford upon both sides of the river near the outlet of Long bay, upon which Folsom's mills formerly stood. It was not deemed necessary to determine the exact location of the line between the bed of the river that belongs to the plaintiffs and the bed of the lake that belongs to the state. Prior to 1846 there was a dam in the river upon this land, which enabled the owners to use the bay to some extent as a mill-pond. After 1846 the plaintiffs, at an expense of about $500,000, deepened the outlet of the lake at The Weirs, making Long bay an arm of the lake, and built a new dam in the river on their land, a short distance below the old one, of sufficient height and strength to control the lake and hold the water in times of freshet. The purpose and effect of these changes were to make the lake, including the bay, a reservoir, and enable the plaintiffs to equalize the flow of water from it, and thereby improve water-powers on the Merrimack river, in which they were interested. The quantity of water annually flowing from the lake was not increased. The area of the reservoir thus made is 71¾ square miles; and nearly the whole of its basin was and is the property of the state.

It was held that the state, by the acts of 1831 and 1846, granted to the plaintiffs a perpetual right to a reasonable use of the lake as a reservoir and source of a reasonably uniform stream for the improvement of the mill privileges upon Winnipiseogee and Merrimack rivers, subject to the limitation that the right of navigation upon the lake should not be unreasonably impaired thereby, and also subject to the right of the owners of mill privileges upon said rivers to have the water of the lake come down its natural course, without unreasonable diminution or an unreasonable degree of irregularity caused artificially. This construction was a material element in fixing the value of the plaintiffs'

real estate. If by the true construction the right above described was not granted, if the grant is revocable without compensation, or if the state, by the exercise of any other power than eminent domain, can stop the plaintiffs' reasonable use of the lake as a reservoir or prevent their making reasonable changes in its natural level, the value of the plaintiffs' real estate is less than that found.

It was also held that the state owned the shore of the lake between the lines of high and low water, and that this ownership bore on the value of the right granted to the plaintiffs.

July 17, 1889, the plaintiffs' stockholders sold their shares in the plaintiffs' capital stock to Warren F. Daniell for $85,000, reserving certain personal property. The sale was in every respect, with a single qualification, what the authorities of this state require to show the market value of a thing sold; and it was the best evidence of the market value on that day of the beneficial interest of the equitable owners in all the corporate estate and franchises except the reserved personal property. The qualification was, that while the stockholders could not have got more by a fair sale, they might have got less if the plaintiffs' water rights had been understood to be limited as above set forth.

A lease of a mill privilege upon the Winnipiseogee river at East Tilton from the plaintiffs to the P. C. Cheney Company, dated July 1, 1886, for a term expiring in 1995, contains a stipulation that " the total flow of water at the said dam of said lessors shall not, by any act of said lessors, be reduced below 250 cubic feet of water for each second of time, except when the same may be shut off for necessary repairs." Before July, 1889, the plaintiffs had made contracts of the same character with other persons, but none that required them to allow a larger quantity of water to flow in the river. As a matter of fact these contracts do not limit or impair the rights acquired by the plaintiffs under the acts of 1831 and 1846. The allowance of the flow stipulated in the contracts is no more than a performance of the plaintiffs' duty to equalize the stream by a reasonable use of the lake. The sale vested in the purchaser all the control of the lake the plaintiffs ever had. If the flow stipulated in the contracts infringes upon the right of navigation in the lake (a subject not investigated at the trial), the valuation placed upon the plaintiffs' real estate is too high.

The judgment upon the referees' report in the plaintiffs' appeal from a refusal of the selectmen of Gilford to abate a part of the plaintiffs' taxes in 1884 (64 N. H. 337) was received in evidence. It was held that the judgment conclusively established the fact that the plaintiffs' property then taxed could have been sold for $275,000, the valuation which the referees placed upon it. Due weight being given to this adjudicated fact and to all the other

evidence in these cases, it was found that the value of the plaintiffs' real estate, taxable in Gilford in 1890, 1891, and 1892, was $57,000, and that the plaintiffs' taxes should be abated to conform to this valuation. The plaintiffs, being content with the conclusions of law and fact, moved that decrees be entered accordingly; the defendants objected.

*E. A. & C. B. Hibbard* and *Edward B. S. Sanborn,* for the plaintiffs.

*Jewell & Stone, Bingham & Bingham,* and *Samuel C. Clark,* for the defendants.

*Jewett & Plummer,* for Laconia.

CHASE, J. The finding that the plaintiffs' charter conveyed to them rights in the lake, as stated in the case, is favorable to the defendants. Its tendency was to increase the market value of the plaintiffs' real estate. The defendants have no occasion to object to it; and the plaintiffs have waived their objection by moving for decrees in accordance with conclusions of law and fact, founded, in part at least, upon the finding.

It does not appear that the plaintiffs' land in Gilford was bounded by the lake. If it was not, the ruling that the state owns the shore of the lake between high and low water marks was immaterial. If it was so bounded, and if, according to the true construction of the conveyance, the plaintiffs' title extends to low water mark, the error in the ruling was substantially neutralized by the finding that the state conveyed to the plaintiffs in their charter the rights above mentioned. Such rights would give the plaintiffs much the same use of the shore that they would have if they owned it. *Concord Manufacturing Co.* v. *Robertson,* 66 N. H. 1, 17, 18. The difference between the value of the shore itself and the value of such rights in it must be slight. As it appears improbable that the defendants' rights were prejudiced by this ruling, and as they have not specifically objected to it, the question of law involved in it is not considered.

"The selectmen shall appraise all taxable property at its full and true value in money, as they would appraise the same in payment of a just debt due from a solvent debtor" (P. S., *c.* 58, *s.* 1), that is, "at its just value." P. S., *c.* 233, *s.* 1. Such value is the market value, or the price which the property will bring in a fair market, after reasonable efforts have been made to find the purchaser who will give the highest price for it. *State* v. *James,* 58 N. H. 67; *Atlantic & St. Lawrence Railroad* v. *State,* 60 N. H. 133, 140; *Low* v. *Railroad,* 63 N. H. 557, 562; *Winnipiseogee Lake Cotton & Woolen Manufacturing Co.* v. *Gilford,* 64

N. H. 337, 348. An attempt was made at the trial to find such value of the plaintiffs' real estate in Gilford. Unless testimony was excluded that ought to have been considered, or testimony was received that ought not to have been considered, the finding of value there made, being a finding of fact, must stand.

The record of a judgment as to the value of the plaintiffs' real estate, April 1, 1884, in a prior action between these parties for an abatement of taxes, was received as evidence. The defendants do not object to the competency of this evidence, but they claim that the judgment conclusively established the value of the property for taxation in 1890, 1891, and 1892, and that evidence of an intervening sale of the property was therefore inadmissible. If experience showed that the market value of real estate never changed, there would be ground for this contention; but it is well known that it does change, sometimes to a considerable extent in a brief space of time.

_Atlantic & St. Lawrence Railroad_ v. _State_, 60 N. H. 133, was an appeal from the assessment of taxes upon the company's railroad in this state for the year 1879. The company leased their railroad to the Grand Trunk Railway in 1853 for 999 years, reserving a certain rental. It was held that the rental was evidence of the market value of the road at the date of the lease, although not conclusive. In the opinion it is said (_p._ 142),—" If the value of the leased road increased from the date of the lease to the present time, the less value of 1853 cannot be taken as its present value on which its present share of the public expense is to be computed; and if its value diminished during that period, its greater value in 1853 is not the test of its present share of the common burden. For the purpose of taxation in 1853, it should have been appraised at the highest price it could have been fairly sold for on the first day of April of that year. For the purpose of taxation this year, it should "be appraised at the highest price it could have been fairly sold for on the first day of April of this year, and not at the greater or less price for which it could have been sold or leased at some former time. The price at which it was sold or leased at any former time is evidence only so far as its proof of a former value tends to show the price for which it could have been sold on the first day of April, 1879. If on that day it could not have been leased by an owner of the entire title at the price of 1853, it would be as wrong to make that price the test of the value of 1879 as to appraise it now at less than its present value because it was once sold or leased for less than it is now worth." The judgment in the prior action between these parties as to the value of the property in 1884 differs from evidence of a sale or lease of the property at that time only in its weight and binding effect. In the judgment, all uncertainty resulting from considering and weighing conflicting evidence bearing on the question of value is eliminated: the judg-

ment established the value of the property at the time to which
it referred. If, instead of a judgment, the evidence had related
to a sale or lease, it would have been necessary to find the value
at that time from a consideration of the sale or lease, the circum-
stances surrounding the making of it, and all other evidence
relevant to the question of value.

It was proper to consider, in connection with the judgment,
other evidence as to the value of the property in 1890 and subse-
quent years. The evidence of the sale of their stock by the
plaintiffs' stockholders to Daniell, July 17, 1889, was properly
received. The question of its competency by reason of remote-
ness was one of fact. Its decision at the trial term is not re-
viewable here. It is found, as a fact, that the sale was in every
respect what the law requires in a sale to give it weight as evi-
dence of market value, with the single qualification that the
stock might not have brought as much if the corporation's water
rights had been understood to be limited, according to the views
taken of them at the trial term. This qualification did not injure
the defendants. The sale transferred the equitable ownership,
and was practically a sale of all the property and franchises of
the corporation. The price received for the stock was, in effect,
the price which the property and franchises of the corporation
brought, if the corporation was not indebted; and it is not sug-
gested that it was. There was no error in admitting this testi-
mony. *Atlantic & St. Lawrence Railroad* v. *State*, 60 N. H. 133,
141.

The plaintiffs leased to the P. C. Cheney Company, July 1,
1886, for a term extending to 1995, a mill privilege at East
Tilton, and stipulated that "the total flow of water at the said
dam of said lessors shall not, by any act of said lessors, be
reduced below 250 cubic feet of water for each second of time,
except when the same may be shut off for necessary repairs."
They made contracts of the same character with other parties, but
none that required them to allow a larger quantity of water to
flow in the river. The defendants claim that these contracts
rendered it impossible for the stockholders to sell the entire bene-
ficial interest in the control of the lake, and that the price
obtained for the stock was a price for an encumbered title of the
property. It is found that the flow stipulated for in these con-
tracts was no more than a performance of the plaintiffs' duty to
equalize the stream by a reasonable use of the lake, and that the
stockholders' "sale vested in the purchasers all the control of
the lake the plaintiffs ever had." The owners of mill privileges
upon the Winnipiseogee and Merrimack rivers have a right to
the natural flow of the rivers without unreasonable diminution
or alteration. *Cowles* v. *Kidder*, 24 N. H. 364; *Tillotson* v.
*Smith*, 32 N. H. 90, 94; *Holden* v. *Lake Co.*, 53 N. H. 552, 560;
*Concord Mfg. Co.* v. *Robertson*, 66 N. H. 1, 29. But the natural

flow might be controlled to a reasonable extent by arresting the excess in times of high water and releasing it in times of low water, and so equalizing the flow throughout the year. *Cochecho Mfg. Co.* v. *Strafford,* 51 N. H. 455, 477, 480; *Thompson* v. *Androscoggin Co.,* 54 N. H. 545, 558. This control of the lake as a reservoir is limited within the bounds of reasonableness, having reference to the rights of riparian owners upon the rivers forming its outlet. It is found that such limitation requires the plaintiffs to release at least 250 cubic feet of water each second, independently of any express contract on the subject, and consequently that the contracts do not increase the duties which the law otherwise puts upon the plaintiffs, nor create an incumbrance upon their title. ' Such being the fact, there is no ground of objection to the ruling that the price received for the stock was the price received for an unencumbered title to the plaintiffs' property.

There should be judgment for abatements in accordance with the finding at the trial term.

*Case discharged.*

DOE, C. J., and CLARK, J., did not sit: the others concurred.